$$\text{To American rights} \text{_____} \$36,500$$
$$\text{To Canadian rights} \text{_____} 3,500$$

"My Years Behind the Barbed Wires":

$$\text{To American rights} \text{_____} \$1,700$$
$$\text{To Canadian rights} \text{_____} 300$$

The above figures will be employed in the computations of taxes due.

*Decision will be entered under Rule 50.*

ERNEST A. WATSON AND M. GLADYS WATSON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 18856.   Promulgated December 7, 1950.

*Arthur McGregor, Esq.*, and *Charles. J. Higson, Esq.*, for the petitioners.

*A. J. Hurley, Esq.*, for the respondent.

804

**OPINION.**

TURNER, *Judge:* The question here is what portion, if any, of the gain realized by the petitioner upon the sale of the orange grove property is attributable to the growing crop of oranges then on the trees and, if any portion of the gain is attributable to the oranges, whether under section 117 of the Internal Revenue Code it is, or is to be considered as, gain from the sale of capital assets.

That the oranges did not constitute capital assets as capital assets are defined in section 117 is at once apparent, and that is so whether the oranges be regarded as an inseparable part of the trees and therefore real estate used in petitioner's trade or business, as claimed by her, or as property held by the taxpayer primarily for sale to customers in the ordinary course of her trade or business, as claimed by respondent, since by the specific language of section 117 (a) of the Code [1] both real estate used in the trade or business and property held primarily for sale to customers are excluded from the definition of capital assets. It is the claim of the petitioner, however, that section 117 (j) [2] applies, and that if any part of the gain from the sale of the property

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1). * * * or real property used in the trade or business of the taxpayer.

[2] (j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * *

(2) GENERAL RULE.—If during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, * * * exceed the recognized losses from such sales, exchanges * * * such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets." * * *

as a whole was properly attributable to the oranges on the trees at the time of sale, it was gain realized from the sale of real estate used by her and her brothers in their business of owning and operating the orange grove property and under that section gain realized from the sale of real property used in a taxpayer's trade or business is to be considered as if it were gain from the sale of a capital asset. In developing this contention, the petitioner argues first that this is a case which turns on the nature and character of property rights and that in such cases state law is controlling, and second, that under California law and the general law of most states, oranges growing on the trees at the time of sale of an orange grove properly constitute a part of the real property.

One difficulty with that argument is that there is no hard and fast rule under California law or, so far as we have found, under the law of any state, unless it be Georgia, that a growing crop of oranges or any other growing crop is, or is not, to be regarded as a part of the real estate.

The Civil Code of California (Deering 1933) provides as follows:

§ 658. *Definition of real property.* Real or immovable property consists of:
1. Land;
2. That which is affixed to land;
3. That which is incidental or appurtenant to land;
4. That which is immovable by law; except that for the purposes of sale, emblements, industrial growing crops and things attached to or forming part of the land, which are agreed to be severed before sale or under the contract of sale, shall be treated as goods and be governed by the provisions of the title of this code regulating the sale of goods.

§ 659. *Land.* Land is the solid material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock, or other substance.

§ 660. *Definition of fixtures.* A thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines, or shrubs; * * * except that for the purposes of sale, emblements, industrial growing crops and things attached to or forming part of the land, which are agreed to be severed before sale or under the contract of sale, shall be treated as goods and be governed by the provisions of the title of this code regulating the sale of goods.

Under California law, fruit trees are not growing crops, but the word "crop" includes fruit grown on such trees. *Cottle* v. *Spitzer*, 65 Cal. 456, 4 Pac. 435; *Story* v. *Christin*, 14 Cal. (2d) 592, 95 Pac. (2d) 925.

*Wilson* v. *White*, 161 Cal. 453, 119 Pac. 895, involved an action for specific performance brought by the purchaser under a contract of sale of an orange grove with oranges on the trees which oranges the seller had reserved under the terms of the contract. There it was said:

While for some purposes growing crops are considered personal property, it is practically elementary law that, as between the vendor and vendee of real property having a growing crop thereon, such crop constitutes *a part of the realty*

(unless there has been a constructive severance), and in the case of a voluntary conveyance of the land passes to the grantee unless specially reserved by the grantor.

And while there are some authorities holding that an oral exception or reservation of the crop is effective in such a case, the weight of authority as well as the better reasoning are to the effect that, where a writing is essential to the transfer of real property, such a reservation cannot be established by parol to impair the effect of the writing purporting to convey the land without reservation. See 8 Am. & Eng. Ency. of Law (2d Ed.) pp. 303, 306. And this court appears to have committed itself to this doctrine in *Fisk* v. *Soule*, 87 Cal. 313, 25 Pac. 430, where it was substantially said that a written contract for the sale of land which did not contain any reservation of the crops bound the grantor to include the crops in his conveyance, notwithstanding an oral understanding that the crops were not to be included, "unless corrected on the ground that by mistake it was not in accordance with the agreement actually made." * * * [Emphasis added.]

In *Young* v. *Bank of California*, 88 Cal. App. (2d) 184, 198 Pac. (2d) 543, a real estate broker sought to collect a commission on a sale of an orchard with the growing crops thereon for $125,000. In the negotiations the purchaser insisted on purchasing the properties separately, $57,500 to be paid for the crops and $67,500 to be paid for the land, in order to comply with Federal income tax regulations covering the payment of income taxes on capital gains, as distinguished from income. Having no written contract with the seller covering the transaction and being faced with the bar of statute of frauds, the broker contended, among other things, that he should be compensated at least for the sale of the growing crops because they did not come under the bar of statute of frauds. In denying his contentions, the court said:

* * * The sale was one transaction. The purchase price was segregated between the land and the growing crops merely to meet the federal regulations regarding income taxes—to show whether the purchase price of the crops should be treated as capital gains or income. But growing crops under our decisions are a part of the realty until severed just as growing timber is part of the land. *Sears* v. *Ackerman*, 138 Cal. 583, 72 P. 171; *List* v. *Sandell*, 42 Cal. App. 2d 505, 507, 109 P. 2d 376. It is undisputed that throughout all the dealings the parties herein treated the sale of the land and crops as one transaction and there is nothing in the record indicating that any one of them would have considered the sale of one without the other. There is no basis upon which appellant can make a segregation of the sale of the crops from the sale of the land and his case must stand or fall upon the basis of a single transaction covering the entire property.

From the foregoing, it appears that under California law, for the purposes of sale, fruit on the trees is part of the realty and passes as such to the purchaser upon a sale of the land and trees unless there is a specific provision to the contrary in the contract of sale.

The respondent contends that the line of decisions of the California courts represented by *Wilson* v. *White, supra*, and *Young* v. *Bank of California, supra*, holding that growing crops pass as part of the

realty upon sale of the latter, is not determinative of whether the orange crop here involved was or was not real property. Relying on certain decisions involving crop mortgages, he takes the position that the instant orange crop was not real property.

Paragraph 2955 of the Civil Code of California provides as follows:

*What personal property may be mortgaged.* Mortgages may be made upon all growing crops, including grapes and fruit, and upon any and all kinds of personal property, except the following:

    1. Personal property not capable of manual delivery;
    2. Articles of wearing-apparel and personal adornment;
    3. The stock in trade of a merchant.

Subsequent paragraphs of the Code provide for the manner of mortgaging growing crops.

In *Simpson* v. *Ferguson*, 112 Cal. 180, 44 Pac. 484, it was contended that the provisions of the Code relating to the mortgaging of growing crops did not establish an exclusive method for that purpose and that a mortgage upon the land, with its rents, issues and profits, gave the mortgagee a valid lien on the growing crops on the land. In rejecting the contention, the court said:

\* \* \* In the first place, we think it quite manifest, from the provisions of the Code in question that the legislature intended thereby to provide an exclusive mode for the mortgaging of growing crops, and intended to declare that for such purposes this species of property shall be regarded as a chattel. There is nothing in the statute to indicate that it was not intended to cover every case of a mortgage given upon that class of property. In the second place, while it is perfectly true that growing crops may be either personal or real property, according to circumstances, and while as suggested by respondent, a mortgage of the land gives a lien upon everything that would pass by a grant of the land, which includes crops growing thereon, it is nevertheless well established that such lien, so far as the growing crops are concerned, is limited in its effect to the crops growing upon and unsevered from the land at the time of foreclosure. \* \* \*

*Congdon* v. *G. M. H. Wagner & Sons*, 207 Cal. 373, 278 Pac. 863, involved the question of whether a mortgage on a crop of grapes, executed and recorded in accordance with the provisions of Section 2955 et seq. of the Civil Code, affected the title to the land upon which the grapes covered by the mortgage was being grown and constituted a lien or charge on the land. In holding in the negative, the court said:

\* \* \* It has, however, been held consistently by this court that growing crops are personal property (*Marshall* v. *Ferguson*, 23 Cal. 65; *Davis* v. *McFarlane*, 37 Cal. 636, 99 Am. Dec. 340), and that crop mortgages made, executed, and recorded under the provisions of section 2955 et seq. of the Civil Code do not affect in any degree the title to the land upon which the crops covered by said crop mortgage are being grown and that the same do not constitute a lien or charge upon the land. (*Simpson* v. *Ferguson*, 112 Cal. 180, 40 P. 104, 44 P. 484, 53 Am. St. Rep. 201; *First Nat. Bank* v. *Brashear*, 200 Cal. 389, 253 P. 143.)

It was also early decided by this court that a growing crop of fruit occupied the same relation to the land as a growing crop of grain, and as fructus industriales was personal property which might properly be subjected to a chattel mortgage. * * *

In addition to the contrariety of views taken by the California courts with respect to the character of growing crops in that state, we find that in Massachusetts they are regarded as chattels, *Commonwealth* v. *Galatta*, 228 Mass. 308, 117 N. E. 343, while, in Arkansas, they are treated as real property if planted by the land owner, but personalty to the land owner if planted by his tenant, *Western Union Telegraph Co.* v. *Bush*, 191 Ark. 1085, 89 S. W. (2d) 723. By statute, in Georgia all crops, matured or unmatured, are personalty. Under the statute the word "crops" includes the fruits and products of all plants, trees and shrubs, whether the same be annual or perennial, and also crude gum from a living tree. Code of Georgia Annotated, Sections 85–1901 and 85–1902. Under such statute, it was held that a growing crop of pecan nuts on the trees was personalty and that the crop did not pass as part of realty by sale and conveyance of the land, *Miller* v. *Jackson*, 190 Ga. 668, 10 S. E. (2d) 35. *Haines City Citrus Growers' Association* v. *Petteway*, 105 Fla. 135, 145 So. 183, involved the question of whether fruit crops produced on mortgaged land were subject to the real estate mortgage or to a crop mortgage. There the court said:

Growing citrus fruit crops, such as oranges, grapefruit, and tangerines, which essentially owe their annual existence to cultivation and labor, including fertilizing and spraying for control of insects and diseases which attack and injure the fruit, though products of perennial plants or trees, are chattels, while the trees themselves are part of the realty. * * *

A further illustration of the variety of situations involving growing crops and the conflict of views taken with respect thereto appears in *Vought* v. *Kanne*, 10 Fed. (2d) 747 (CCA–8). The question there was whether a bankrupt's homestead exemption under the laws of Minnesota included the growing grain crops on the homestead. In holding that the exemption did not extend to such crops, the court said:

Growing crops occupy an unique legal position. They spring from and are physically attached to the land, but are intended to be and may be severed therefrom without injury to the land. When so severed there can be no question that they are then personal property. There is some conflict in the different jurisdictions as to whether such crops, while unsevered, are personalty or realty but the great weight of authority is that unsevered annual crops are personalty. 17 C. J. 379, note 5; 8 R. C. L. 356, notes 13 and 14. This was the common-law rule and it has been followed in most of the American Jurisdictions. 23 L. R. A. (N. S.) 1219, note. However, it is hardly correct to say that any jurisdiction, where there are decisions upon different character of transactions affecting growing crops (such as conveyances, statute of frauds, ejectment, trespass, landlord and tenant, execution levy, attachment, inheritance) has held such crops in all instances and as to all transactions to be either personal

property or real property. The determination "depends very greatly on the nature of the transaction in which the question arises." * * *

If, then, the above may be regarded as fairly reflecting the law of California and of other states with respect to growing crops and the disposition thereof, petitioner's argument, in effect, is that since under the California law of conveyancing oranges on the trees pass with and as a part of the real estate unless specifically reserved or excluded, and since petitioner and her brothers sold the entire property without any reservation of the oranges on the trees, that fact determines the. character of the oranges and of any gain realized thereon, for the purposes of section 117 of the Internal Revenue Code, and, under subsection (j) thereof, the gain must be considered as capital gain. Correspondingly, it would also follow, if that contention is sound, that if the oranges had been separately sold the gain realized therefrom would have been ordinary gain and not within the scope of section 117. In other words, the method or manner of sale or the form which the sale took would be controlling.

In *Helvering* v. *Hammel*, 311 U. S. 504, however, it was held that the manner in which a sale was effected was not determinative of whether the resulting loss was a capital loss or an ordinary loss. And in *Burnet* v. *Harmel*, 287 U. S. 103, the Supreme Court, pointing out that Congress had enacted the Federal income tax statutes in the exercise of its plenary powers, under the Constitution, to tax income, said:

* * * It is the will of Congress which controls, and the expression of its will in legislation, in the absence of language evidencing a different purpose, is to be interpreted so as to give a uniform application to a nation-wide scheme of taxation. * * * State law may control only when the operation of the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law. * * *

The Court there, as here, was concerned with the character of income as capital gain or ordinary gain, and it went on to say that "For the purpose of applying this section to the particular payments now under consideration, the act of Congress has its own criteria, irrespective of any particular characterization of the payments under local law. See *Weiss* v. *Wiener*, *supra*, page 337 of 279 U. S., 49 S. Ct. 337, 73 L. Ed. 720. The state law creates legal interests, but the Federal statute determines when and how they shall be taxed."

Accordingly, the fact that under the law of California the oranges on the trees were or were not to be regarded as real property for the purpose of construing the conveyance and for the purpose of determining and concluding rights as between seller and purchaser does not supply the answer to the question here. To the contrary, the answer must be found in the Federal statute, and a reading of that statute plainly shows that it is not whether property is realty or

personalty, or is to be regarded as one or the other for certain purposes or in certain circumstances, which determines, whether gain realized from the sale thereof is to be taxed as capital gain, but rather it is the purpose for which the property is acquired or held or the use to which it is put that supplies the answer. Real property may or may not be a capital asset, or it may or may not be an asset the gain from the sale of which is, under section 117 (j), to be considered as capital gain. It must likewise be real estate used by the taxpayer in her trade or business, and not only that, but it must be real estate "which is not * ` * * (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." In the circumstances here, it is not enough, therefore, merely to find that the growing crop of oranges was real estate or was to be regarded as real estate under local law. It must also be found that the oranges did not constitute property held primarily for sale to customers in the ordinary course of her trade or business.

That in the instant case the oranges, exclusive of the land, trees and improvements, did in fact constitute a distinct and important item or element in the lump sale which occurred, is not, in the light of the evidence, now open to question. Petitioner and her brothers, back in May or June, at the time the orange trees were blooming or the blossoms were dropping, had offered the property at the price later obtained. but had received no takers and, as far as we know, no counter offers. Pogue was approached but was not interested until he could determine as accurately as possible the extent of the current crop. He also wanted to avoid, as much as possible, the burden and cost of cultivating the crop. It was only after the oranges had reached the stage at which satisfactory estimates of the crop could be made that a sale was negotiated. During negotiations or at or about the time of the closing of the contract, and for the apparent purpose of having a record of what was sold, Louis L. Dofflemyer, who had been manager of the grove for many years, made a survey and estimated that the crop on the trees would be approximately 70,000 loose boxes of oranges, normal crop conditions thereafter being granted. The harvest later proved the estimate to be very sound. As far as Pogue was concerned, the quantity and condition of the oranges, plus the price anticipated when the crop should reach maturity, supplied to him the controlling inducement for buying the entire property at the price paid, and for cash. On the basis of his experience that freeze years occurred in cycles, W. Todd Dofflemyer, who negotiated the sale, felt certain that the season of 1944–1945 would be a freeze year and desired to cash in before cold weather, letting the purchaser run the risk of crop loss due to frost. His testimony, in effect, was that if he had not thought there would be a crop loss due to frost, and had thought they would have received

ceiling price for the oranges, he would not have sold but would have held the property. In other words, all of the parties to the sale did, in fact, regard the oranges as a crop of fruit on the trees, and not as trees or land. Pogue was buying oranges which he planned to harvest and sell to customers. Petitioner and her brothers were selling their crop of oranges for cash in hand, allowing to the purchaser the added revenue if they reached maturity without loss and the high prices continued.

That farmers, fruit growers, and the like regard, think of and deal with their crops, whether growing or mature, as being something apart from or other than the land itself, is, we think, so generally known and accepted as to require no discussion or amplification here. The crop is their stock in trade and from the time the fruit appears on the plant, vine. or tree. it is thought of in terms of the units by which it is measured for sale and of the anticipated prices per unit. In short, the primary purpose and objective of the farmer or fruit grower is the sale of his crop to some customer or customers. It is, of course, true that in some instances a crop may not be held primarily for sale to customers, but rather for use in processing, developing, or producing some other commodity for marketing, as in the case of corn or other grain grown for the purpose of conversion into beef or pork, which in turn becomes the commodities held primarily for sale to customers. But here we have no such a case.

The petitioner argues, however, that the oranges in this instance were not held primarily for sale to customers in the course of her trade or business, because she and her brothers were in the business of producing and selling ripe oranges and not in the business of producing and selling green oranges. Granting that petitioner and her brothers had never before sold their oranges prior to maturity, that fact in no way negatives the proposition that the oranges were held primarily for sale by them in the ordinary course of their business. It is fundamental, we think, that the grower, all factors being considered, seeks to sell his crop at the time and in the manner he considers to his best advantage, and while the evidence indicates that since the development of better protective devices against the natural hazards of orange growing and the advent of the compulsory "prorate" method of harvesting oranges, there have been no known sales of crops of oranges prior to maturity in the area in which the property herein was located, we are unable to see how the holding of the oranges primarily for sale to customers is changed to a holding primarily for some other purpose because the grower manages to realize his purpose to sell by making a sale to his liking before the oranges are mature, or because as a part of the same transaction the land was also sold.

On the basis of the picture presented, it is our conclusion, and we

hold, that the oranges sold by petitioner and her brothers did not constitute real estate used by them in their trade or business which was "not  *  *  *  (B) property held by [them] primarily for sale to customers in the ordinary course of [their] trade or business," and, accordingly, the provisions of section 117 (j) do not apply.

Petitioner cites and relies on *Albright* v. *United States*, 173 Fed. (2d) 339; *Fawn Lake Ranch Co.*, 12 T. C. 1139; *Isaac Emerson*, 12 T. C. 875; *Butler Consolidated Coal Co.*, 6 T. C. 183; *Camp Manufacturing Co.*, 3 T. C. 467; and *J. J. Carroll*, 27 B. T. A. 65, affd., 70 Fed. (2d) 806. Those cases are distinguishable, and are not controlling here. *Butler Consolidated Coal Co.* was the case of a taxpayer engaged in the business of mining coal. The property sold was land from which it had at one time mined coal and which still contained some coal. The mining operation had been abandoned some eleven years prior to sale of the property and the mine had been allowed to fill with water. It was held that the coal in place was not held primarily for sale to customers in the course of the taxpayer's trade or business. *Camp Manufacturing Co.* and *J. J. Carroll* are cases involving the sale of tracts of standing timber by owners who were engaged in the manufacture and sale of lumber. The opinion in each of those cases pointed out that the principal business of the taxpayer was the using of timber in the manufacture of lumber, and not the sale of timber tracts themselves. In the instant case, the petitioner was never engaged in the business of using oranges for the purpose of producing another product. Her business was that of producing oranges for sale to customers. Though the oranges passed through various stages of growth from bloom to maturity, at each stage they were held for one and the same primary purpose, namely, for sale to customers, and never at any stage of operation were the oranges held for or devoted to any other purpose. The *Albright*, *Emerson* and *Fawn Lake Ranch* cases are as to the instant case even more remote. There, the petitioners were in the dairy, livestock or cattle business, and the sales involved were sales of animals culled from breeding and dairy herds. In those cases, the animals in question were not held primarily for sale, but for the purpose of producing the animals and other products which were held primarily for sale. To make those cases comparable to the instant case, it would be necessary for us here to be dealing with gains realized by petitioner and her brothers from the sale of the orange trees themselves.

Since the orange crop was not a capital asset, the portion of the total selling price allocable thereto is to be treated as an amount received from the sale of a noncapital asset. In determining the deficiency the respondent determined the portion of the total selling price allocable to the orange crop to be $122,500, and the petitioner's one-third share thereof as $40,833.33. On brief, he contends that the

portion allocable to the crop was not less than $120,000. The petitioner contends that the allocation of $10,700 would be reasonable and in no event should such allocation exceed $16,000.

Each of the parties produced a number of witnesses who gave testimony bearing on the value of the various properties including the orange crop at the time sold. Values expressed for the orange crop ranged from a low of approximately $4,000 to a high of approximately $120,000. In general, the values for the orange crop expressed by petitioner's witnesses were substantially below the amount expended to the time of the sale for the production of the crop. On the contrary, they placed substantial values on the other assets included in the sale. The respondent's witnesses, on the other hand, placed much higher values on the crop and substantially lower values on the other assets. The top value now contended for by the petitioner for the orange crop, namely, $16,000, is approximately the amount expended to the date of the sale in the production of the crop, while the $120,000 value contended for by the respondent is about $6,000 less than the net amount realized by Pogue after he had held the crop to maturity and gathered and sold it. From a consideration of all the evidence bearing on the question, we are of the opinion that the portion of the total selling price properly allocable to the orange crop was $40,000, and have so found as a fact.

The remaining issue is whether the total selling expenses of $10,232.50 should be allocated between the crop of oranges and the other assets sold. No such allocation was made by the respondent in determining the deficiency. However, on brief, he concedes that such expenses should be allocated between the crop and the other properties in the proportion that the portion of the total selling price allocable to each bears to the total selling price. Since the respondent's concession disposes of the issue, we hold for the petitioner as to it.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

———

BLACK, *J.*, dissenting: I agree with the majority opinion that what is a capital asset in determining whether the gain from the sale of property shall be taxed as capital gain or as ordinary income depends on statutory definition as written by Congress. It is not governed by state law. Congress, of course, could tax all income from the sale of capital assets as ordinary income if it chose to do so. The term "income" as used in the Constitution and income tax laws has been defined by the Supreme Court as "the gain derived from capital, from labor, or from both combined, provided it be understood to include profit or gain from a sale or conversion of capital assets." *Stratton's Independence* v. *Howbert*, 231 U. S. 399; *Doyle* v. *Mitchell*

*Bros.*, 247 U. S. 179; *Eisner* v. *Macomber*, 252 U. S. 189. But Congress has elected to provide in section 117 of the Internal Revenue Code that gains from the sale of certain property shall be taxed as long term capital gains and that only 50 per cent of the gain shall be taken into account for the computation of income tax. Generally the term "capital assets" as defined by Congress includes all classes of property not specifically excluded in the statutory definition. The term is defined in the statute, as follows:

SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or real property used in his trade or business;

\* \* \* \* \* \* \*

At the outset, I wish to make it plain that I do not question the feasibility of dividing the sale which took place here into its component parts. I accept as correct the doctrine in *Williams* v. *McGowan*, 152 Fed. (2d) 570, where taxpayer sold a hardware business as a going concern, including accounts receivable, fixtures, and merchandise inventory, that the whole business was not to be treated as a single piece of property representing "capital asset" for income tax purposes, but the sale would be comminuted into its fragments and these would be separately matched against the definition in the statute of capital assets.

It is perfectly clear to me that in the instant case Pogue, the purchaser, bought himself a growing orange crop when he made the purchase here involved. I am also willing to believe that the growing orange crop had a fair market value of $40,000 at the time of sale and that as found by the majority "The portion of the selling price of the Dofflemyer ranch, $197,000, allocable to the growing crop of oranges on the trees, was $40,000." But that does not, in my opinion, solve the problem which we have here. The problem is whether this growing crop of unmatured oranges on the trees is excluded from the definition of "capital assets" by the exceptions enumerated in section 117. I do not think they are excluded. Clearly, the immature oranges which were on the trees at the time petitioner sold them were not "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year" as those terms are used in section 117. Were

they "property held by the taxpayer *primarily* for sale to *customers* in the *ordinary* course of his trade or business" (emphasis added), as provided in section 117 (a) (1) (A) ? If they were, then the majority opinion is correct because its conclusions are based on that particular provision of the statute and the majority has made an affirmative finding that the unmatured oranges were "property held by the taxpayer primarily for sale in the ordinary course of his trade or business." But I think there is much force in petitioner's contention as stated in the majority opinion, as follows:

The petitioner argues, however, that the oranges in this instance were not held primarily for sale to customers in the course of her trade or business, because she and her brothers were in the business of producing and selling ripe oranges and not in the business of producing and selling green oranges. * * *

Of course, it goes without saying that if a producer of oranges, such as was petitioner in the instant case, sells the oranges on the trees after they have matured the income therefrom would be ordinary income and not capital gain. She would be selling property held *primarily* for sale to *customers* in the *ordinary* course of her trade or business. That business was the growing and selling of ripened oranges. In other words, she would not have to pick them off the trees and sell them after they were picked in order for the income to be taxed as ordinary income. The ordinary income provisions of the statute would be quite as effective in cases of selling fruit matured, still unpicked on the trees, at it would be in selling the fruit after it was picked—I certainly concede that fact. But where, as here, the land is sold, together with the producing orange trees and the immature oranges on the trees, it seems to me the situation is different. In that sort of a situation the property sold is "real property used in the trade or business of the taxpayer" as used in the last sentence of section 117 (a) (1).

If I am correct in this assumption, then section 117 (j) is applicable which was added as an amendment by section 151 (b) of the 1942 Act. Subsection (j) which was thus added reads, as follows:

(j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *.

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, * * *

exceed the recognized losses from such sales, exchanges, * * * such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

If section 117 (j) is applicable to the sale of the entire property here, as I think it is, then even though it is possible to divide the sale into component parts as the majority opinion does, petitioner's entire gain from the sale is taxable as long term capital gain as petitioner contends and the gain from the sale of the unmatured oranges is not ordinary income as the Commissioner has determined and the majority opinion holds.

Of course, it is perfectly true that Congress by appropriate definition could exclude gain from the sale of unmatured crops, such as we have here, from the benefits of the capital gains provisions of the statute, but I do not think it has done so when the statutory definitions and exceptions are given their ordinary and commonly understood meaning.

I would, therefore, sustain petitioner in her contention that the gain from the sale of the unmatured orange crop here involved should be taxed as long term capital gain and not as ordinary income. I, therefore, respectfully dissent.

HARRON, J., agrees with this dissent.